vs. Chia Jean Lee and Theodore William Taylor. So we'll begin with Mr. Hornsby. May it please the Court. Thank you, Your Honor. My name is Troy Hornsby. I practice in Texarkana, Texas at the law firm of Miller, James, Newell & Hornsby. I represent, the way she says it, Chia Jean Lee. I was appointed to represent Ms. Lee. Now, I've raised seven issues, and that's rather complicated, and there's a lot, and I apologize for that. But this is a complicated case, and it's complicated factually and legally. So it was called for, and all these are legitimate issues. I'm going to touch on the high points of most of those issues. With your permission, I'm going to skip on the issue of venue. And the reason I'm going to do that is my co-appellant has a little more expertise in that area. We spent some time talking about it, and I'm convinced he knows a lot more about this venue issue than I do. So with your permission, I'm going to sort of skip that issue, leave it to him. The first issue was the deliberate indifference charge, instruction, excuse me. Now, that's a rare instruction, and it was given in this case, and it can be given, but there has to be a basis for it. And the basis is some specific evidence that the person deliberately turned a blind eye and the phraseology in some of the case law, which is fantastic, is a charade of innocence. So the question is what is the charade of innocence? That's a purposefully avoiding a learning of some sort of illegal or incorrect conduct and then using that to protect yourself. So the question is what is that charade of innocence? Is there a charade of innocence here? Now, my client didn't testify. So if it came out, it didn't come from my client, and if you ask me, that's the end of the story. That's it. We're done. That situation is resolved. There is no evidence to support being given that instruction because she didn't testify. Now, the government points to somebody's argument. Was there an objection made or are you viewing this for plain error? No, there wasn't a specific objection made to the deliberate indifference instruction. There was an objection raised by Dr. Taylor's trial attorney, and he objected to the instruction. And then Ms. Lee's trial attorney followed up on that objection and also lodged an objection and specifically talked about the lack of knowledge and specifically addressed the fact that my client didn't testify, which is pretty much the basis of my point. She didn't testify. There was an objection she didn't testify, so that instruction shouldn't be given. Now, is it your testimony that the instruction is only allowed when the defendant testifies and then puts it at issue? Well, legally, no, Your Honor. I'm not saying that that's a legal requirement, but practically speaking, I guess you could get there some other way with some other evidence, but practically speaking, I would presume that whether a defendant testified or didn't testify would probably resolve 90% of those cases or issues in 90% of the cases. I'm not saying it's an absolute requirement. No, sir, I'm not. Now, the government points to the arguments of Ms. Lee's attorneys, and we know from the case law that the evidence is what we look at, not the arguments. So I don't think that can form a basis of the instruction. The government also points to evidence of the division of labor between Ms. Lee and Dr. Taylor, and that's an interesting point, but we know from the Laura Velasquez case that the evidence we look at is evidence from Lee. Again, that's why I point to the fact that she didn't testify. So we can't look at evidence produced by a co-defendant to support the instruction. So Lee didn't testify. Lee did not testify. There was no specific evidence of her burying her head in the sand. So this rather dangerous instruction shouldn't have been given. And I've seen the government will say that any error is harmless. Do you want to address that? Yes, Your Honor. In essence, they argue that the evidence of Ms. Lee's involvement in the conspiracy was strong. That can best be addressed if you look directly at my Issue 6. Issue 6 is saying there is no evidence of her involvement in the conspiracy. If you look at it, the evidence is nearly circumstantial at best, and it is light. So if there's overwhelming evidence of her guilt, yes, I would agree that that would be irrelevant. But I don't think there is overwhelming evidence of her guilt. Again, the evidence is circumstantial at best, and it just puts her in a bad situation. There's no direct evidence of her specific agreement or involvement in the conspiracy. Do you have six more issues? Yes, ma'am. Yes, ma'am. I'd like to touch on the second one, which is, I think, fabulously interesting. I've never seen this happen, the premature deliberation issue. So the case is going along in the government's case, and there's a note from the jury. And the jury says, hey, we're not really clear. What the heck are these charges? What's going on here? And everyone is immediately concerned about premature deliberations. I'm sorry, the three attorneys voice concerns about that. So the judge, all right, well, we're going to take a look at this. Let's start asking these jurors what goes on. Now, I won't bore you with the specific details, but there were three jurors who said there were some incorrect instructions from the marshal. Okay. Several, I believe eight jurors, said that there was some confusion about the charges. Fine, some confusion. And then there was juror 10. Juror 10 said something, basically said, well, I don't know about you guys, but I made up my mind. I'm done. Now, the judge says, all right, juror 10, you're out of here. Solve that problem. Well, yes and no. It did solve the problem with juror 10. That's true. And this is important where we tie in. The government points out a case called Martinez. And Martinez basically says, hey, there was a jury, and the jury was a little confused about the charges, and they had some discussions about that. That's not very material, and it didn't really mean anything. Well, I agree. And if we were just talking about the instructions and discussion, I think Martinez would control, and you wouldn't have an argument about premature deliberations. The problem we have here is juror 10. Juror 10 said, made up my mind. I'm done, in the mantle of the state's case. That's premature deliberations. Now, the government's going to say, well, yeah, but juror 10's gone. Problem solved. Yes, but let's take a look at Resco. Resco lays out what are our concerns about premature deliberations. Let's take a look at those. There are six of them. Number one, our first concern about premature deliberations, that a juror will reach incision and influence other jurors with his opinion. Wait. 10 reached a decision. 10 reached a decision early, and you got rid of 10, but you didn't address Resco factor number one. Didn't the district court address that? Didn't the district court do some due diligence? I thought there was some evidence that it was determined he didn't talk to anyone else. Well, no specific discussion of that, but that's not exactly what Resco says. Resco says – I'm sorry. I believe I answered your question. I don't believe there was any evidence that juror 10 had a discussion or twisted anybody's arm. I agree with that, yes. But Resco's not saying, hey, these things have to be addressed. Resco's saying, hey, these are our concerns. This is why we worry about premature deliberations. This is why we're not going to allow premature deliberations. These things might happen. Not that there's evidence of it, but these things might happen. You might influence other jurors. You might ignore additional evidence. You might force the deliberative process. Has your time expired? I'm sorry. I didn't know. I apologize. I apologize. Do you have some time on the button? Yes, Your Honor. Mr. Edgerton? Yes, sir. Thank you, Your Honor. My name is Gary Edgerton from Dallas, and I represent Dr. Taylor on this appeal. And as my co-counsel mentioned, I do know a bit about the venue issue, and that's really all I want to talk about today. And the reason why I know about this particular issue is that I was the appellant's attorney on the Ian Batali case, which is where I started digging into the venue. And what we have here in this case is really round three of the Eastern District of Texas coming before this court with cases where they're reaching out and grabbing cases where the Eastern District is not the appropriate venue. And I know there were other cases prior to Romans, but Romans is where I think it really became an issue before the court. And I know this panel in particular is very familiar with these issues because two of the judges were on the Romans panel, but I think Judge Costa's concurring opinion in Romans really put the Eastern District on notice that the court had issues with them taking cases where they were probably not the appropriate venue. And when we came before the court on Ian Batali, then that's, I think, where it really came to a head with the court. And the oral argument from Ian Batali, which I listened to again a couple of days ago, is enlightening as far as the court's attitude. And I would note that in the district court here on this case, Dr. Taylor's lawyer actually cited some of the comments from the oral argument from Ian Batali in addition to the Ian Batali opinion. But just for your context, you're right, this is a real concern of mine. The problem for you that I see is venue's a jury question. The jury found venue, so that's entitled to a lot of deference. We have to take all inferences in favor of that jury decision. And how do you respond? I mean, there were these papers involving the business found in their home in the Eastern District. So why wasn't the jury entitled to decide that they used their home to help facilitate this pill mill conspiracy that the jury found? Well, Your Honor, that's exactly the point that the government points to to try to distinguish this case from Ian Batali. And I understand where the court's coming from. Of course, Ian Batali, the jury found against Ian Batali also, and the court reversed that nevertheless. But the only distinction between Ian Batali and this case is what the court points to as far as Dr. Taylor and his wife getting some paperwork home or having some paperwork at their house and also taking funds, some of the cash that they took in in the clinic home with them and then later depositing some of it in some Eastern District bank located in the Eastern District. But really what that comes down to is the key question here is, are those acts part of the essential conduct elements of this offense, or are they incidental? And so it's a question. And I know it's not a simple analysis, but the question is on a conspiracy to distribute drugs, which is what Dr. Taylor and his wife were charged with, is there anything about taking paperwork home or taking the funds home or depositing the funds in a bank that is anything other than incidental to the allegation against the system, or are those just not? I think when you look at the statute, the 21 U.S.C. 846 statute, and you look at the jury instructions and you look at everything that the government is required to prove here, there's nothing about these little incidental things that the government points to that in any way go to essential elements of the offense. The essential elements of the offense is an agreement among Dr. Taylor and his wife to distribute drugs outside normal medical practice. And these things that occurred by taking things home really have nothing to do with the essential elements. But the test isn't essential elements, is it? My understanding is the case law, which I criticize in my own opinion, I think the case law says that even for a conspiracy charge that does not have an overt act requirement, which is true of this one, there is no overt act being an essential element. But the case law says even if that's true, you can find venue if an overt act occurred in the district of prosecution. It's not that it's an essential element. Isn't the question whether an overt act took place in the Eastern District? Well, Your Honor, the overt act has to affect, has to further or affect the object of the conspiracy. And the Nehemiah Talley opinion from this court really made it clear what the object of the conspiracy there was. And it's the same here. It's for the conspirators to profit by receiving the cash for the doctors right in the prescriptions. That's what I'm looking at in the theory of the government's case. I'm sorry. That's why I don't understand why getting the money. It's the money from the business, right? It's going to the bank that's in the Eastern District, isn't it? Well, yes. At least some of the cash, according to the evidence, some of the cash is deposited in a bank in the Eastern District. That's correct. But proceeds from the business is the object of the drug conspiracy. Receiving the cash is the object of the conspiracy. And according to the Nehemiah Talley opinion, the object of the conspiracy is accomplished when the conspirators receive the cash. So what they do with the cash is not an overt act in furtherance of the conspiracy. I see my time is up. Thank you. Your time is up. We'll hear from Mr. Oestreicher. Thank you, Your Honor. May it please the court, I'm Stephen Oestreicher on behalf of the United States. Just to pick up where Mr. Yudishin left off, which is on venue, I would say a couple of things. The cash wasn't just coming, and this is important in a couple of ways, the cash was coming back into the Eastern District of Texas where the defendants lived. But more than that, it then was fed by them. They fed that money back into the Northern District and kept the pill mill running by paying their staff, paying the Richardson Medical Authority for it. This was their livelihood, after all, and it was their salary. So they're paying themselves in the Northern District of Texas, and they bring the cash home to the Eastern District of Texas. I think this is not along the lines of, I understand the court's concerns and Judge Costa's concerns in the Roman's case about a conspiracy that's centered in Indiana, many, many districts away. This was the neighboring district in which the defendants themselves lived. As your honors have noted today, they brought documents home with them. I think you'll see... And I get the distinction. I mean, here, some of my concerns about the community, the jury should be a jury of your peers from your community. I mean, they did live in the Eastern District here, unlike in Roman's. I get that point. But I'm a little concerned about this spending the proceeds argument. I mean, let's say they got the cash. It was basically a cash business. They got the cash. They went to the airport from the doctor's office, and they went to Vegas and spent it at a casino. Would Nevada have venue over the case because they took proceeds there? I think that's a much more difficult question. I think it's... You do look to... Mr. Yudishin was drawing this distinction between essential and incidental. I think the question is, it's something like that. Does it further the offense? Does the overt act further some... Is it to effect the object of the offense? One of the objects here was for the defendants to profit themselves. So I don't mean to resist the hypothetical. I think, in your Honor's hypothetical, I do think they would be... It would be in furtherance of a drug conspiracy because they're paying themselves, but that's a much more difficult case than this one because it is furthering the pill mill. It's allowing them to keep writing prescriptions. And I think in the United States... The brokerage account, say, in New York, they sent money there, and then out of that brokerage account, they were paying employees and the like. You would say Southern District of New York, if it was based in Manhattan, the brokerage account would have venue. And maybe, I mean, venue's expansive. That's what I was criticizing. Maybe that's right, but I assume that would be your view? I believe that it is, yeah, although it does seem... And here, I mean, I know the fairness concerns are always in the background. And here, one of the fairness concerns would be, you know, what is the Eastern District of Texas' interest here? Even beyond the Overt Act, which, in our view, we do have for all the reasons the Court has been discussing. Just as a matter of simple fairness, we're talking about these defendants were going to, it looked like at least from the documents, they'd been pre-approved for a loan based on proceeds that they already maintained or retained from this pill mill. And they were about to open a clinic in the Eastern District of Texas, in Allen, Texas. The government, this district, did not have to wait around until the defendants set up shop in our home district and then started using their pill mill proceeds to further the conspiracy. Unless there are further questions about venue, I would turn back to the deliberate ignorance instruction. Did you reflect that instruction? I think both parties did. Sorry. I think both parties proposed instructions that included the deliberate ignorance instruction. And both parties said they expected it to apply. Wait. You're saying that the defendants asked for that instruction themselves? They initially did. Sorry. And then they initially did, excuse me, pre-trial. And then they did, when the district court gave them the instructions at trial after the charge, and there's an off-the-record charge conference and then there's an on-the-record one. I don't know what was said at the off-the-record one, but on the on-the-record one, then they did object. But based on the fact that their version of the balancing instruction was not given. So the statement that Dr. Taylor's counsel made was, Your Honor, this doesn't convey the requisite state of mind. I think the district court could have, and the way in which the defendants themselves had included this pattern instruction in their proposed instructions is relevant to how the district court would have understood their objection. In our view, the district court could have seen that as, well, I'm not including their portion of the balancing instruction, and that's the problem they have with it, and your objection is overruled. You won't see anything in the transcript where the court says, I disagree with your argument that the evidence doesn't support this instruction. The reason it didn't say that is because the defendants didn't make that argument. Let me ask you, why would the government have asked for this instruction, knowing our legion of case law that says it's rarely to be used, and I think Araujo Jacobo, in so many cases where we've said it's not appropriate to be given, and people, they need to quit asking for it and quit giving it, except in a rare case. And we've cautioned and admonished, and we've reversed a couple of times now that I can remember. So why did the government take that risk? I think, Your Honor, that, well, the first thing I would say is we do view this as an actual knowledge case, and so I understand Your Honor's concern there. I think we anticipated, and it played out this way, I think we anticipated exactly the argument that the defendants were going to make, and the evidence that they would elicit, which they did, and Ms. Lee says, well, I didn't testify, so it wasn't elicited from me, but she did elicit from the government's witnesses and from Dr. Taylor evidence about how the defendants kind of, there was this front-of-the-house versus back-of-the-house distinction that you see in what we've called in our brief the division of labor. But I think in Dr. Taylor's reply brief especially, and you'll see it pages four to eight, these are the very arguments that they make in support of their sufficiency claims. Okay, I'm still not clear, and I'm sorry, you have a lot of time left, so I'm not concerned about that right now. Of course. Why did the government ask for it in an actual knowledge case, given our case law? I think, and I don't, I mean, I don't know that this was unfortunately on anyone's, high on their radar, but it is, again, I do think that there is evidence in this case, and because of that reason, we think it was something fair for the government to point out where the defendants say, look, we didn't know what was going on in our own clinic because we were in the other side of the clinic. And we just think that argument can't, if the jury, if we said to the jury, jury, look, the defendants actually knew. Now the defendants will tell you, they didn't know. What we would say in response to that is if they didn't know, the reason they didn't know was because they specifically set this up not to know. And you're still allowed to convict them if they stuck their heads in the sand. They didn't know. They're not saying anything. I think that's, I mean, I think the evidence they elicited was that they didn't, that they didn't know that they didn't know what, in Dr. Taylor's case, he didn't know what was going on at the front of the clinic. He didn't have anything to do with the finances. He didn't see what was going on in the waiting room. And Ms. Lee was saying that she wasn't in the examination room. She didn't have the authority to write prescriptions. And so she couldn't have known what those, the content of the prescriptions was. Now that's contrary to the other evidence. For one thing, she was in the back of the house at much of the time. She was Dr. Taylor's gatekeeper. And you'll see that at page 1808 of the record. She was, she was administering drug tests. She knew that people failed those drug tests. So, I mean, again, and I, and maybe what the argument I'm now making is I guess I'm bleeding over into a, to a harmlessness argument and to a prejudice point that, that your honor referred to earlier. I think that is, I think that is maybe just the easiest way to resolve this question. It was error to give the instruction and therefore we should, you should win anyway because of harmlessness. Is that the government's point? I don't think so. It's certainly not a plain error review. I don't think it was. It's not plain error. And we're of course going to have to study the record again on that point, but assuming that they made a timely objection to the instruction, does the government concede that it was error in a, an actual knowledge case to give this instruction? I don't think so because I think there was enough evidence elicited from the defense. I do think this is the closest, this is the closest issue in the case as to whether there was error or not. It is not a close issue on the harmlessness point in our view because the evidence of actual knowledge is overwhelming. But what do we do with the fact that we've had case law about that too, that says if we always affirm, because we say there's plenty of evidence on actual knowledge, even though we said repeatedly not to give this instruction, then the lesson never gets learned. I think, well, I think the lesson here, well, again, I just don't think that those cases fully apply here. I do think that there was, I mean, it is a, it's difficult because it's not something that applies across the board in every single case the same way. I think in each of these cases, the court has said in the Odie case and the, and the rights of Jacobo case that your honor referred to, I think those cases mentioned that this is a, it's a very fact-bound inquiry. So I don't think the parties always are going to know exactly how the evidence is going to play out. And I think the government wanted to make sure to cover all its bases for the precise types of arguments that the defendants have made and the way they've tried to sort of preserve their plausible deniability by setting up these, what in their view are watertight compartments of the clinic, which in our view are not. But if they, if they had managed to achieve that, to achieve this kind of watertight division between them, it would have been a fair argument for us to come back. And it was a fair argument in our view to come back and say, no, the reason you didn't know is because you specifically tried not to know. How could you have not known what was going on under your nose for 25 months in the other side of the clinic? When you're married to the other. You may not know it when you submit your initial information at the trial conference, perhaps. But by the time you have your formal charge conference, you already know it's canned at that point. No, I think that's a, I think that's a fair point, but I, as I say, I think that that in this case, that's exactly. And you'll see, even though the defendants during that charge conference on the record said nothing about whether the evidence supported the structure and the government made the point to the district court that the evidence did support the instruction in the way that the defendants elicited it. And I think you'll see that it's roughly at page 2385 of the record. As to the, just to touch on the, the other issues defendants have raised this morning, which is the premature deliberation point here. I think the case law for us is, is quite strong. I mean, the, the areola case from 1995 puts the burden squarely on the defendants to prove. So the jury is presumed impartial. The defendants have the burden of proving that the jury is partial, that they prematurely deliberated. This is a case where the deference owed to the district court we think is abusive discretion plus, because the way this that any jury misconduct is always reviewed under a, under a, an abusive discretion standard, but here where it's internal misconduct and allegedly premature deliberations, the, the, the standard seems to be even higher. I think, so there were three issues, Mr. Hornsby identified three pieces of evidence that he said supported an allegation of premature deliberation here. One was juror number 10, juror number 10 was dismissed as Mr. Hornsby noted, but more than that. So of course he couldn't have directly affected the verdict and he couldn't have indirectly affected the verdict either because as judge Elrod pointed out the district court did do its due diligence here. It did ask every single juror, including juror number 10. Did you, have you talked about the case? Did you discuss the merits of the case? Juror number 10 specifically said, no, he had not. So we think that that is, the defendants are unable to rebut their presumption there. When the, when juror number nine asked the question of what are the charges, juror number nine in, you know, in some collaboration with other jurors on this confusion about what are the charges, that was as, as Mr. Hornsby noted, I think that's pretty similar to what happened in Martinez in some other cases, which is that they're not discussing the merits. They're not discussing guilt or innocence. And it's a very high standard. That's, that's basically what Arreola says is the standard is, did they prematurely decide guilt? I think. And then the CSO's comment where the CSO said you cannot, and this jurors number one, five and eight are the jurors who brought this up. The CSO apparently commented that you can only discuss the case back in the case, not to the when, but to the where. There's nothing in that comment that suggests that you, that they could immediately discuss the case. And that would be something that would have contradicted what the district court had already told the jurors at nine Oh seven and nine Oh eight of the record, which is don't talk about the case until the end. And York says the presumption is again, another heavy presumption that works against the defendants, which is that we presume the jury's that the jurors follow their presumptions. And that's an overwhelming probability to the contrary. So, and again, we don't think they've shown that. In fact, the CSO's other comments, and we don't know if the record doesn't disclose whether the CSO was saying this to all of the jurors or just a few of them, but certainly some jurors took the point from the CSO that they couldn't discuss the case in the end in the jury room. And they were supposed to kind of hold everything in their head until then. So the question that prompted all this from the juror, which is basically I'm paraphrasing, but basically, you know, what, what, what are the charges? It's a perfectly natural question when you're sitting through a trial, especially a lengthy one. In fact, the number, because of that, a number of district judges are moving towards substantive preliminary instruction that say generally, you know, wait till my final instructions for the final word. But generally these are the elements that the government has to prove beyond a reasonable doubt to give that, that framework. Anyway, I think that sort of colors this whole thing about whether there was some permissible or impermissible deliberations going on. Right. And it's interesting. I mean, I think in this case, the district court did give them enough preliminary instruction to understand the concept of conspiracy. I'm not sure why it didn't translate to them, but for whatever reason, it just didn't. And that's unfortunate, but again, you know, I think none of the reasons the defendants have cited in support of, of their premature deliberations wins under the case law. I think, and if I could take just a moment, I know there are a number of other issues. I just, just to pick one that I think hasn't been fully explored in the briefs because the defendants in the reply briefs raised a new point on this, which is on the sentencing point on the drug quantity. The defendants are talking now about, you know, which guidelines manual should have applied and claiming that the district court erred in applying the 2011 guidelines. That argument in our view is totally waived. It can't be considered at this point because they raised it for the first time in their reply briefs. More, more than that, even if the court were to consider it, it's subject to review for plain error because the defendants didn't object below to which addition of the guidelines apply. And then one final note about it is under what, under either the 2011 version or the 2018 version, the defendants are offense level base offense level 36 either way, because there's one thing under the, the 2011 guidelines that favors them, which is the more lenient treatment of hydrocodone. And then 2018 has the harsher treatment, but vice versa is that the drug, the overall drug table is lower two levels in 2018 and in 2011. Now what the defendants want to do is they want to get the defendant, the benefit of both sides of that, but they can't do that. You're not allowed to pick and choose from particular manuals. You have to apply the whole book of a man. And there's such a thing as the whole book rule under section one B one point 11 under the guidelines that you have, you can't. And I think the way this court has referred to it is that provision precludes piecemeal application of particular portions of guidelines, manuals. So I would just reiterate that point. We think that the 2011, the district court didn't, if it erred in applying the 2011 guidelines it certainly didn't plainly err in applying either way. And if I, I mean, I could, you could put it this way that the district court in the probation office erroneously thought that there was an ex post facto problem because both versions were exactly the same, but that, that would not have prejudiced the defendants in any way because they faced the same offense level. Um, if there are specific questions the court has about any of the remaining issues with my, my two minutes left, I, I would just ask, uh, unless the court does, I would just, um, uh, ask the court to affirm the judgments. Thank you, your honors. Thank you, sir. Back to Mr. Hornsby. You have two minutes. Yes, your honor. Thank you. I'll try to watch my time. I'm just not used to this on the screen. Um, all the deliberate, uh, deliberate, uh, on the instruction, there was discussion about the pretrial conference and that that was a charge conference. But as we know, we can talk about what we think the charge is going to be. And many, many, many times that changes throughout the trial based on the evidence that comes up. Now here, they did discuss and said they anticipated that the deliberate and different instruction would apply. But as the trial went on at the end, they said, well, wait a minute, there's no evidence. So the fact that they talked about at the beginning means nothing because, uh, what matters is the evidence. So we have to look at the end of the end zone. Now on the objection, there was some discussion in the state, in, in the government's brief about, well, they were talking about the balancing test. If you look carefully, the objection was to the deliberate and different construction and the balancing test. So there's two different issues. There's clearly an, and there were two different issues. And those both were preserved. Now he said that there was no objection, that there was no evidence with regard to deliberate instruction. Ms. Lee's attorney specifically said Ms. Lee did not testify. He didn't say air though. There is no evidence. That's what he was saying. He said, Hey, she didn't testify. If she didn't testify, there is no evidence. That's what he meant by that. That's what was done. Now with regard to the harm issue, just a quick analysis. With regard to Ms. Lee's involvement in the conspiracy, there was evidence she was a nurse by training. She was the office manager and it can be there. Her involvement can be inferred from the division of duties. All that is is smells bad stuff. It's all smells bad stuff. It's exactly, you know, about the drug test, even with one of the, um, undercovers, I think that people who were getting prescribed, these opioids were then testing negative for taking them, which would strongly hint they're, they're selling them. Well, so, so you're saying the argument would be that she was aware that somebody had not taken their, their medication. Ergo, she was aware of the conspiracy. Well, right. It shows she, well, the conspiracy is people are being prescribed opiates who don't, who don't need them. That's the conspiracy with her husband. Yeah. I thought she was also copied by, I mean, one of the strongest pieces of evidence in my mind is Bjorkman. You know, the, the, the, the, or the patient whose wife is calling up saying you're, you're making my husband into a drug addict, please stop. And I thought your client was copied on an email from Bjorkman's wife to the doctor. There was evidence that she was copied. Yes, Your Honor. So yeah, if that's enough, if that's enough to say she was involved in the conspiracy, then that would be involvement. That would be evidence of her involvement in conspiracy. If you believe that that's enough. And I'm out of time. I apologize. Have you completed your answer? Yes, sir. I did. I'm sorry. Okay. Thank you. Then that brings us to Mr. Yes, sir. Okay. Thank you, Your Honor. Before we get into the venue question, I do want to answer judge Elrod's question about why the government would request a deliberate ignorance instruction on a case where it hadn't, that had nothing to do with it. And I think the answer is pretty obvious is that it doesn't hurt to have a backup theory for the jury to go on. And I do think the problem that, that, that we have here is, is if the court continues to find this harm, this instruction is given, then there's really no incentive for prosecutors not to request it. And unfortunately judges are giving it when prosecutors request it. And it's just, it just confuses jurors into finding people guilty on a lower standard than they're supposed to be doing. So I think that's the answer to that question. Now, as far as the venue goes, um, the, the as we were discussing really just strictly boils down to the things that, that they took home with them, that Dr. Taylor and his wife took home with them, the thing that they did once they got home. And I would just continue to point to the language in the cases.  the Keiko case where the court upheld venue and they, and this was sort of like the Romans case was transporting across different districts. And they said that the transporting of drugs or drug proceeds was an essential act, not an incidental act. So I think you have to look at what the, uh, things were that were taken home and the things that were done at home. And the question is, are those incidental to the conspiracy or are those, uh, and, and, and it, the same analysis really applies to any sort of overt act question. And overt act is only an overt act for purposes of this venue question. If it's an act done in furtherance of the object of the conspiracy. And again, that just really overlaps with the incidental versus essential question. So the way I would ask the court to look at it is say, was it essential? Was there anything that these defendants did when they went back to the Eastern district of Texas that was essential to the commission or the successful commission of, of this offense? And I think the answer to that is going to be that whatever it is that they, that they did, if they did it was not affected or are furthered in any way by anything that they did in the Eastern district of Texas. Thank you. Okay. That concludes the argument in this case. Mr. Hornsby, you are court appointed. You have fulfilled your duties very well. And the court thanks you for your service. Thank you. To your client.